Booth, Judge,
delivered the opinion of the court:
This is an Indian claim before the court under special jurisdictional acts. The Yankton Sioux is one of the numerous bands of the Great Sioux Nation which anciently inhabited a vast territory in the northwestern section of the country. The Yankton Sioux were known as one of the several bands generally designated as the Sioux of the Missouri. The Government negotiated and concluded various treaties with the different bands, with a view to acquiring title to their lands and providing suitable reservations for their occupancy. As to these treaties, the terms of which appear in the findings of this court in case No. 31253, we need enter upon no discussion. Yankton Sioux v. United States, 53 C. Cls. 67. As usual in such cases disputations arose, claims upon the part of the Indians were asserted, and the controversy with respect to the same culminated in the acts of April 4, 1910, 36 Stat. 269-284, and March 3, 1911, 36 Stat. 1058-1065, referring the case to this court with the limited authority to report back to Congress the court’s findings of fact with respect to the subject matter. The court, from a complete record, reported its findings of fact without comment or allusion to issues of law.
On June 3, 1920, 41 Stat. 738, Congress enacted the special jurisdictional act under which the claim of the Yank- *55 ton Sioux is again before us. The grant of jurisdiction under this statute extended generally to the Sioux Tribe of Indians and comprehended all claims not heretofore determined by the court. Subsequently, on January 9, 1925 (Public No. 318, 68th Cong., 44 Stat. 730), whjle the case was pending under the act of 1920, Congress conferred jurisdiction upon the court to adjudicate the claim of the plaintilf Indians, long asserted and persistently adhered to, for the value of the Bed Pipestone Quarries, as it may or may not appear from¡ the findings of the court in case No. 31253. In other words, the final jurisdictional act recognized the verity of the findings reported in case No. 31253 and granted authority to adjudicate and determine the claim of the plaintiff Indians as the findings in the former case disclose it. The plaintiff Indians did not amend their petition after the passage of the act of 1925. The petition was filed July 31, 1924, and the petition should have been amended. Inasmuch as the record now before us and the original petition itself prefers no claim other than for the Pipestone Quarries, and in view of the fact that the findings in this case, in any event, would be but a duplication of the findings in case No. 31253, we think the state of the record sufficient for us to dispose of the case.
On April 19, 1858, 11 Stat. 743, by express treaty stipulations, the plaintiff Indians ceded all of the lands owned, possessed, or claimed by them, wherever situated, for the sum of $1,650,000, payable in fifty years, at the time reserving for the band a reservation of 400,000 acres on the Missouri River. Not only was this a general relinquishment of all the lands mentioned, but the settlement comprehended all outstanding differences and was designed to conclude the claims of the band against the Government arising from any source whatever. The treaty of 1858 embraced the Pipe-stone Quarries, but from time immemorial the Sioux had enjoyed a common privilege of visiting the quarries and taking therefrom sufficient stone for pipes and Indian ceremonials. Article VIII of the treaty reserved to the Indians this ancient privilege. Manifestly it was at the time, and may now be, a right of value and importance; at least the Yanktons so appraised it and the Government recognized *56 it. The right and privilege, however, was not akin to the right of occupancy, the recognized Indian tribal title. It was in the nature of an easement. Its extinguishment, had the Government ever done so, would not warrant the court in awarding a judgment in any such amount as here claimed. As a matter of fact, however, and the court so finds, the right has not been extinguished by the Government. On the contrary, the easement has been continuously recognized by the Government, and the Yanktons have never been denied the privilege. The quarries are now, and ever have been, open, free, and available to the Indians without let or hindrance upon the part of the Government. There is absolutely nothing in the record to even suggest a contrary finding.
Article XII of the treaty of 1892, ratified by section 12 of the act of August 15, 1894, 28 Stat. 286, 314, 317-319, in nowise constitutes a recognition of title to the lands in question in the Indians. What the legislation covers is a mere grant of authority and direction to determine the validity of the Indians’ persistently asserted claim to the lands. The terms of this article are sui generis. Manifestly, it imposed upon the Secretary of the Interior a duty it was impossible under the law to discharge. The Secretary was powerless to invoke the jurisdiction of the Supreme Court under the law, and the imposition of duty without the added provisions indispensable to its performance was beyond the power of Congress in this respect. This court was confronted with a similar situation in the case of Muskrat v. United States, 219 U. S. 346. Other contentions are advanced by the plaintiff Indians. They are in the main predicated upon inferences said to be deducible from acts of Congress and a decision of the Supreme Court. We have examined them with care. A sufficient answer is found in the apparent fact that Congress, possessed with plenary power and authority over Indian tribal lands and property, in the whole course of its dealings with the matter here involved has carefully refrained from recognizing the validity of the claim here preferred, and in no instance has evinced a willingness to do more than refer the matter to a court for adjudication. This case stands out, in fact, as a *57 conspicuous example of governmental recognition of Indian rights created by treaty stipulations.
The complaint of the plaintiff Indians is, in our view of the record, without merit, and the petition will be dismissed. It is so ordered.
Hay, Judge; Downey, Judge; and Campbell, Chief Justice, concur.
Graham, Judge,
took no part in the decision of this case.